IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE | CASE NO. 25-04894 (ESL) |
| DORADO PUTT PR, LLC | CHAPTER 11 |
| Debtor | FILED AND ENTERED 6/22/2026 |

**<u>OPINION AND ORDER</u>**

This case is before the court upon three (3) interrelated contested matters:

(i)      The *Emergency Motion to Enforce the Automatic Stay and for an Order to Show Cause* filed by the Debtor on November 3, 2025 (the "**Motion to Enforce Automatic Stay**", dkt. #10), as supplemented thereafter (dkt. #18); the court's *Interim Order* (dkt. #11); and the *Objection to [Motion to Enforce Automatic Stay]* filed by creditor Promethean Fund IV, LP ("**Promethean**" or the "**Fund**") on November 17, 2025 (dkt. #29).

(ii)      The *Motion to (I) Dismiss Chapter 11 Case or, in the Alternative[,] (II) Lift the Automatic Stay* filed by Promethean on November 17, 2025 ("**Motion to Dismiss**", dkt. #31); the *Opposition to Promethean Fund IV, LP's Motion to (I) Dismiss Chapter 11 Case or, in the Alternative (II) Lift the Automatic Stay* filed by the Debtor on December 3, 2025 ("**Opposition to Motion to Dismiss**", dkt. #63); the *Joinder to [Opposition to Motion to Dismiss]* filed by Frank "Buddy" Gadams and Katherine Gadams (the "**Gadamses**") (dkt. #75); the *Reply to Debtor's Opposition to Motion to (I) Dismiss Chapter 11 Case or, in the alternative (II) Lift the Automatic Stay* filed by Promethean on December 10, 2025 ("**Reply to Motion to Dismiss**", dkt. #83); the *Joint Report on Motion to Dismiss Chapter 11 Bankruptcy Case* filed on December 9, 2025 ("**Joint Report**", dkt. #81); the evidentiary hearing held on December 12, 2025 (the "**December 12 Hearing**") (<u>see</u> *Minutes*, dkt. #95); *Promethean's Proposed Findings of Fact and Conclusions of Law on its Motion to Dismiss Chapter 11 Bankruptcy Case* ("**Promethean's Proposed Findings of Fact**", dkt. #119, 171-1 (TAB 8)); *Dorado Putt PR LLC's and Frank and Katherine Gadams' Proposed Findings of Fact and Conclusions of Law Regarding [] Motion to Dismiss []*

("**Debtor's Proposed Findings of Fact**", dkt. #120, 173-2). See also *Transcript of Hearing Held on December 12, 2025* ("**Hr'g Tr.**"), dkt. #105, 120-1, 124-1, 131-1.

(iii) The *Motion to Lift the Automatic Stay* filed by Promethean on December 15, 2025 ("**Motion for Stay Relief**", dkt. #91); the *Opposition to Promethean Fund IV, LP's Motion to Lift the Automatic Stay* filed by the Debtor on January 2, 2026 ("**Opposition to Stay Relief**", dkt. #112); the *Reply to Debtor's Opposition to [] Motion to Lift the Automatic Stay* filed by Promethean on January 9, 2026 ("**Reply to Stay Relief**", dkt. #118); and the evidentiary hearing held on January 13, 2026 (see *Minutes*, dkt. #133). See also *Transcript of Hearing Held on January 13, 2026*, dkt. #136.

For the reasons discussed herein, the *Motion to Dismiss* (dkt. #31) is GRANTED, and the case is hereby dismissed. Consequently, the court need not decide whether enforcement of or relief from the automatic stay is appropriate.

Introduction

As an introductory matter, this court issued an *Order Authorizing Filing of Documents Under Seal* on December 2, 2025 (dkt. #57), wherein it authorized the filing of Confidential Information, as such term is defined in the *Urgent Motion for an Order Authorizing the Filing Under Seal of Certain Exhibits and Information Relating to Confidential Arbitration* (dkt. #27), under seal and/or redacted pursuant to 11 U.S.C. § 107(b), Fed. R. Bankr. P. 9018, and P.R. L.B.R. 9018-1. See also *Order Authorizing and Directing the Filing Under Seal of Unredacted Documents Previously Filed in Redacted Form*, dkt. #169.[1] To the extent this *Opinion and Order* is premised on and refers to Confidential Information filed under seal, any such references are limited to those necessary for the resolution of the issues presented and are made in compliance with the *Order Authorizing Filing of Documents Under Seal*. Notwithstanding, all pleadings and documents filed in support constitute part of the record and have been considered.

---

[1] See *Motion in Compliance with Order* filed by Promethean (dkt. #171), and *Joint Motion in Compliance with Order* filed by the Debtor and the Gadamses (dkt. #173).

<u>Legal Issue</u>

Whether the Debtor's petition was filed in bad faith and, consequently, constitutes "cause" for dismissal under Section 1112(b)(1) of the Bankruptcy Code, 11 U.S.C. § 1112(b)(1).

<u>Uncontested Material Facts</u>

After reviewing the record, including the uncontested facts outlined in the *Joint Report* (each an "**Uncontested Fact**") (dkt. #81), the *Declaration of Michael Wallace Burt* ("**Burt Decl.**", dkt. #81-1)[2], and the facts proposed by the parties in *Promethean's Proposed Findings of Fact* (dkt. #119, 171-1 (TAB 8)) and *Debtor's Proposed Findings of Fact* (dkt. #120, 173-2) (each a "**Proposed Fact**"), and all documents admitted into evidence at the December 12 Hearing[3], the court finds the following material facts are uncontested:

**I.      The Loan Documents[4] and Relationship Between the Parties**

      **A.      Who is Puttshack?**

1.      Puttshack Ltd. and Puttshack USA (collectively, "**Puttshack**") own a luxury miniature golf company with operations in the United Kingdom and the United States. <u>See</u> Uncontested Fact ¶ 5; Burt Decl. at ¶ 6.

2.      Puttshack borrowed funds pursuant to a certain credit facility dated October 6, 2022 (the "**Credit Agreement**")[5] extended by entities affiliated with BlackRock Financial

---

[2] The Declaration of Michael Wallace Burt ("**Mr. Burt**") was admitted into evidence in its entirety as Mr. Burt's direct examination, as supplemented by his live testimony at the December 12 Hearing. <u>See</u> *Minutes*, dkt. #95, pp. 2-3, lines 22-1; December 12 Hr'g Tr. at 143:9-20, 146:9-14.

Mr. Burt is a member of Promethean Fund IV (GP), LLC, the general partner of Promethean Fund IV (GP), LP, which in turn is the general partner of Promethean Fund IV, LLC. <u>See</u> Burt Decl. at ¶ 1.

[3] The documents identified as Exhibits and Joint Exhibits are those referenced in the *Joint Report*, admitted into evidence at the December 12 Hearing. <u>See</u> *Minutes*, dkt. #95. <u>See also</u> dkt. #81-2.

[4] The term "Loan Documents" includes the Credit Agreement, the Credit Support Agreement, the Limited Partnership Agreement, and the Look-Through Letter, as these terms are defined herein.

[5] A copy of the Credit Agreement was provided to Chambers and admitted into evidence at the December 12 Hearing. <u>See</u> *Minutes*, dkt. #95. <u>See also</u> dkt. #81-2.

Management Inc. (together, "**BlackRock**"). See *Credit Agreement*, Exhibit B; Hr'g Tr. at 28:15-29:25.

3. The Credit Agreement provides BlackRock with certain default remedies if Puttshack's debt obligations are not met, including, but not limited to, foreclosing upon Puttshack and its assets, and taking all equity ownership in the company. See *Credit Agreement*, Exhibit B; Hr'g Tr. at 37:10-25.

**B.** **Who is Promethean?**

4. Promethean is a Delaware limited partnership. See Uncontested Fact ¶ 3.

5. Promethean was formed for the purpose of making investments in the consumer, leisure, entertainment and hospitality sectors in the United States and United Kingdom. See Uncontested Fact ¶ 4; Burt Decl. at ¶ 5.

6. Promethean's primary purpose is to act as guarantor or backstop to Puttshack's debt obligations. See Burt Decl. at ¶ 7; Hr'g Tr. at 28:15-29:5, 29:15-21, 124:7-9; *CSA*, Exhibit C.

7. To that end, Promethean entered into a credit support agreement dated October 4, 2022 (the "**Credit Support Agreement**" or "**CSA**")[6] whereby it is required to secure capital in the event Puttshack defaults under the terms of the senior loan facility. See *CSA*, Exhibit C.002, 003 (§§ 1(a)-2) and 006 (§ 3); Hr'g Tr. at 29:15-17.

8. Pursuant to Section 2(a) of the Credit Support Agreement, Promethean "absolutely, irrevocably and unconditionally guarantees, as a primary obligor and not merely as a surety … the due and punctual payment and performance of the Obligations, including amounts that would become due but for the automatic stay under Section 362(a) of the Bankruptcy Code." *CSA*, Exhibit C.003 (§ 2(a)).

9. The guaranty outlined in Section 2(a) the Credit Support Agreement "constitutes a guaranty of payment when due and not of collection …" *CSA*, Exhibit C.004 (§ 2(b)).

---

[6] A copy of the CSA was provided to Chambers and admitted into evidence at the December 12 Hearing. See *Minutes*, dkt. #95. See also dkt. #81-2.

10.     Pursuant to Credit Support Agreement, Promethean "agrees that, upon the occurrence of a Triggering Event, the Fund Parties [(including Promethean)]] shall immediately send written notice … instructing Series A Investors to fund Capital Contributions in accordance with their Capital Commitments under Article III(c) of the Partnership Agreement … in an amount necessary to cause Obligations to be repaid in full in cash (up to the Specified Amount)." *CSA*, Exhibit C.006 (§ 3(a)).

11.     The Credit Support Agreement provides BlackRock with certain default remedies if Puttshack's repayment obligations are not met. <u>See</u> *CSA,* Exhibit C.007-008 (§ 4(c)).

**C.     <u>Who is the Debtor?</u>**

12.     The Debtor is a limited partner of Promethean. <u>See</u> Uncontested Fact ¶ 1.

13.     The Debtor was created for the business purpose of making investments on behalf of the Gadamses. <u>See</u> Burt Decl. at ¶¶ 15, 18; Hr'g Tr. at 23:9-16, 28:2-6.

14.     The Debtor's first investment was in Promethean. <u>See</u> Burt Decl. at ¶¶ 15, 18; Hr'g Tr. at 23:9-16, 158-159:23-3 ("Q. So when you created Dorado Putt, what was the intention by creating Dorado Putt? A. So the intention was to find good investments, and you need to start somewhere. So we started with — with Promethean Fund IV, and … over the years … we would be looking for other things to add to that.").

15.     In addition to its investment in Promethean, the Debtor manages and owns various assets. <u>See</u> Hr'g Tr. at 22:6-12, 23:3-8, 26:22-25, 151:16-18, 152:15-18. <u>See also</u> *Amended Schedule A/B*, dkt. #58-1; *Amended Schedule E/F*, dkt. #87-1; *Amended Schedule G*, dkt. #87-1.

16.     Since it was formed, the Debtor has not:

i.      had a board of directors. <u>See</u> Hr'g Tr. at 21:16-17.

ii.     earned any revenue. <u>See</u> Hr'g Tr. at 26:12-14 ("Q. Since Dorado Putt, LLC was formed, it hasn't earned any revenue, right? A. Correct.").[7]

---

[7] <u>See</u> Interim Profit and Loss January 1 - October 31, 2025, *Disclosure Statement*, dkt. #60, p. 60 (Income: "$ -").

iii.    had any material amount of cash. See Hr'g Tr. at 44:13-14 ("Q. But Dorado Putt has never had any money, right? A. Correct.").[8]

iv.    had any employees. See Hr'g Tr. at 20:5-7 ("Q: … the debtor here has no employees, correct? A: Correct".).

### D.    The Terms of the Limited Partnership Agreement

17.    To formalize the Debtor's investment in Promethean, the Debtor entered into an *Amended and Restated Limited Partnership Agreement of Promethean Fund IV, LP* dated October 4, 2022 (the "**Limited Partnership Agreement**" or "**LPA**")[9] with other limited partners (collectively, the "**LPs**," and each an "**LP**"). See *Limited Partnership Agreement*, Joint Exhibit A; Hr'g Tr. at 14:1-3.

18.    Pursuant to the Limited Partnership Agreement:

i.    the LPs "unconditionally" agreed to contribute an aggregate of their respective "Capital Commitment" amount to Promethean. See *Limited Partnership Agreement*, Joint Exhibit A.008 (§ 3.1); Hr'g Tr. at 16:16-20.

ii.    the LPs agreed to enter into a credit support agreement in connection with the senior loan facility to be extended to Puttshack following the initial closing of the Fund. See *Limited Partnership Agreement*, Joint Exhibit A.006 (§1.5(c)).

iii.    if Puttshack defaults under the senior loan facility, Promethean "will call and draw down capital contributions" from the LPs. See *Limited Partnership Agreement*, Joint Exhibit A.006 (§1.5(c)).

iv.    the LPs will be given at least ten days' written notice before capital contributions are due (a "**Drawdown Notice**"). See *Limited Partnership Agreement*, Joint Exhibit A.008-009 (§§ 3.1(c)-3.2(a)).

---

[8] See Balance Sheet dated October 30, 2025, *Disclosure Statement*, dkt. #60, p. 59 (Cash: "$573"). The court notes the $500,000 deposited into Debtor's DIP account following the conclusion of the December 12 Hearing. See dkt. #113.

[9] A copy of the Limited Partnership Agreement was provided to Chambers and admitted into evidence at the December 12 Hearing. See *Minutes*, dkt. #95. See also dkt. #81-2.

v.     "[a]ny controversy or claim arising out of or relating to this [Limited Partnership Agreement], or the breach thereof, shall be settled by confidential arbitration …". See *Limited Partnership Agreement*, Joint Exhibit A.055 (§10.21).

19.    The Debtor's Capital Commitment under the Limited Partnership Agreement is $40,000,000. See *Limited Partnership Agreement*, Joint Exhibit A.090; Burt Decl. at ¶ 16; Hr'g Tr. at 16:5-15.

20.    The Debtor is the largest single LP in Promethean. See Burt Decl. at ¶ 16; Hr'g Tr. at 16:5-15. See also *Limited Partnership Agreement*, Joint Exhibit A.005 and 090.

21.    For each LP that was newly formed for the purpose of making an investment in Promethean, the beneficial owners of such newly-formed entity were required to enter into a guaranty agreement (known as a "look-through letter") to capitalize such newly-formed entity to ensure it could meet any capital commitment call made by Promethean. See Burt Decl. at ¶ 17. See also *Limited Partnership Agreement*, Joint Exhibit A.006 (§ 1.5(c)); *CSA,* Exhibit C.002 (§ 1(a)).

### E.     The Look-Through Letter

22.    The Debtor and its Beneficial Owners (the Gadamses) executed a look-through letter dated October 4, 2022, to personally guarantee the Debtor's debt obligations under the Limited Partnership Agreement (the "**Look-Through Letter**")[10]. See *Look-Through Letter*, Exhibit F.001 (¶ 2); Hr'g Tr. at 60:8-12 ("Q. … And what is your understanding of what the look-through letter is? A. The look-though letter is … a document that I signed and my wife signed as in combination with the [Limited Partnership Agreement] as a signing in our personal capacities."), 60:17 ("A. That operated more like a – yeah, a guarantee.") (referring to the Look-Through Letter), 63:3-6 ("The Court: … my notes say that what Mr. Gadams' testimony is that the look-through letter is a personal guarantee of both himself and his wife as Dorado Putt sent to Promethean."), and 68:16-19.

---

[10] A copy of the Look-Through Letter was provided to Chambers and admitted into evidence at the December 12 Hearing. See *Minutes*, dkt. #95. See also dkt. #81-2.

23.     In pertinent part, the Look-Through Letter reads as follows:

[Debtor's] capital commitment to [Promethean] with respect to the Interest has been and will be funded solely with capital contributions paid to the [Debtor] by [the Gadamses], and the [Debtor] will require [the Gadamses] to contribute no less than [their] pro rata share of the Interest to the [Debtor] in respect to the capital contributions to be made by the [Debtor] to [Promethean]. Each Beneficial Owner [that is, the Gadamses] hereby agrees and is obligated to contribute its pro rata share of the capital to the [Debtor] as is necessary for the [Debtor] to satisfy its capital commitment and contribution requirements to [Promethean].

…

*Look-Through Letter*, Exhibit F.001 (¶ 2). See also Hr'g Tr. at 63-4:9-16.

### F.     The Gadamses

24.     The Gadamses are Debtor's "Beneficial Owners". See Uncontested Fact ¶ 6.

25.     Mr. Gadams is the Managing Member of the Debtor. See Exhibit O.001 at ¶1.

26.     Any action taken by the Debtor is an action taken by Mr. Gadams. See Hr'g Tr. at 11:7- 9 ("Q. Okay. And as you explained to the trustee, everything with respect to Dorado Putt comes through you? A. Yes."), 20-21:15-10 ("Q. If [the Debtor] is to take an action, you, Mr. Gadams, effectuate that action. A. I would take that action on behalf of Dorado Putt.").

27.     Mr. Gadams made the decision to invest in Promethean. See Hr'g Tr. at 21:11-15 ("Q. Okay. And so[,] as Dorado Putt's manager, you decided that Dorado Putt would become a limited partner of Promethean Fund IV, correct? A. As the manager of Dorado Putt, yes, I decided Dorado Putt would invest.").

28.     Mr. Gadams invested in Puttshack prior to 2022. See Burt Decl. at ¶ 13. See also Hr'g Tr. at 30:17-19.

29.      Mr. Gadams served on Puttshack's Board of Directors until approximately July 2024. See Burt Decl. at ¶ 13. See also Hr'g Tr. at 28:7-10, 31-32:23-9, 44:15-19, 49:8-50:19, 54:6-55:13.

30.     As a board member of Puttshack, Mr. Gadams received financial and business information about Puttshack and was familiar with the terms of the senior loan facility extended

by BlackRock. See Burt Decl. at ¶ 14. See also Hr'g Tr. at 28:7-10 (testimony of Mr. Gadams re. board membership), 29:6-9 (testimony of Mr. Gadams re. familiarity with senior loan facility).

31. Mr. Gadams understood that Paragraph 2 of the Look-Through Letter "was effectively a personal guarantee by [Mr. Gadams] and his wife of Dorado Putt's commitment" to Promethean. Hr'g Tr. at 60:8-15, 62:6-12, 68:16-18.

32. Before the Look-Through Letter was executed, counsel for Mr. Gadams proposed eliminating the personal guarantee outlined in Paragraph 2 thereto; however, these proposed revisions were not incorporated into the final executed version of the Look-Through Letter. See *September 9, 2022 Email from John McIntyre*, Exhibit G.001-002; Hr'g Tr. at 68:20-73:21.

33. Prior to commencing this chapter 11 case, the Gadamses transferred their ownership interest in the Debtor into two (2) trusts—the Frank T. Gadams Puerto Rico Revocable Trust and the Katherine W. Gadams Puerto Rico Revocable Trust (jointly, the "**Gadamses' Trust**")—which hold 99.0% and 1.0% of the Debtor, respectively. See Uncontested Fact ¶¶ 7, 8; Hr'g Tr. at 8:9-11, and 9:22.

**II.     Default Under the Loan Documents**

34. On or around 2024, BlackRock declared Puttshack in default under the Credit Agreement but did not demand repayment. See Hr'g Tr. at 38:1-23, 39:5-7.

35. Mr. Gadams was aware of Puttshack's initial default. See Hr'g Tr. at 38:1-18.

36. On May 27, 2025, Mr. Gadams executed a promissory note in the amount of $39,600,000, plus interest, for the benefit of the Debtor (the "**Promissory Note**"). See dkt. #97, pp. 3-4.

37. Under the terms of the Promissory Note, "[a]ll unpaid principal and accrued and unpaid interest … shall be due and payable as follows: (i) seven (7) annual payments of [$500,000.00] each, commencing on January 1, 2026, and continuing on the same day of each successive year thereafter, with the final payment due on January 1, 2032; and (i) a single, lump sum payment … due … on January 1, 2033 …" dkt. #97, pp. 3-4.

38. The alleged purpose of the Promissory Note is to ensure the Debtor had enough capital, over time, to meet Promethean's capital commitment call.

39. Although Mr. Gadams believed or understood that the Limited Partnership Agreement required the Debtor to satisfy Promethean's capital commitment call within thirty (30) days, he nevertheless structured the Promissory Note to defer payment for seven (7) years. See Hr'g Tr. at 165-166:15-5, 167:3-4 ("Q. Why was it structured like that? A. To give me time to put the money together."), 166:9-13, 167:19-21 ("Q. So why did you make the promissory note? A. In order to comply with the -- the capital call of -- in order to fulfill the obligations under the look-through."), 189-190:19-18 ("Q. And you knew the LPA of Promethean to call the money within ten days, right? A. Well, I thought it was thirty … Q. Okay, with thirty days, right? So what you're saying is that, at the time you entered into this promissory note, you knew you were frustrating -- you personally, Mr. Gadams, were frustrating Dorado Putt's ability to repay its obligations in accordance with the LPA, correct? A. That I frustrated their ability? Q. Because you knew it was going to be twenty-two million dollars at least, right? A. I did. Q. Possibly as much as forty. And you structured a promissory note where you would pay all the way to 2032, right? A. Correct. Q. When you knew the LPA agreement permitted the partnership to call that money within, to your recollection, thirty days. A. Which, you know, we didn't have liquidity to pay it. So this was something that was done because of, you know, the -- the look-through letter talks about capital. And a promissory note is a part of capital. And it might have not, you know, satisfied the timing, you know, for them. But you know, I believed that this was a legitimate method of payment, under the look-through to Dorado Putt, to fulfill the obligations.").

40. Prior to the Promissory Note being executed, no collection efforts had been made against the Debtor. See Hr'g Tr. at 167:16-19 ("Q. So when this happened in May, were there any collection efforts made by any creditors against Dorado Putt? A. No.").

41. In May of 2025, BlackRock declared Puttshack in default under the Credit Agreement and demanded payment of 55% of the backstop by September 15, 2025. See Burt Decl. at ¶ 25; Hr'g Tr. at 39:8-11.

42. On June 2, 2025, following Puttshack's default, Promethean issued a Drawdown Notice to the LPs, including the Debtor, due on or before September 12, 2025. See *Drawdown Notice*, Exhibit L.001; Burt Decl. at ¶¶ 25, 26; Hr'g Tr. at 39:12-24.

43. The Drawdown Notice issued to the Debtor is in the amount of $22,156,652.00, 55% of Debtor's capital commitment[11]. See *Drawdown Notice*, Exhibit L.001; Burt Decl. at ¶¶ 25-26; Hr'g Tr. at 39:12-24.

44. The Debtor did not meet its funding obligation under the Drawdown Notice by September 12, 2025. See Burt Decl. at ¶¶ 27, 29.

45. Thereafter, Promethean initiated an arbitration proceeding against the Debtor under the terms of the LPA. See Uncontested Fact ¶ 9; Burt Decl. at ¶ 30; Debtor's Proposed Fact ¶ 38.

46. On October 28, 2025, the Debtor wired $221,567.00 to Promethean, representing a portion of its capital commitment. See *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy*, dkt. #7, p. 32, item. 3.1 (identified as "capital call"); Hr'g Tr. at 39:25-40:2.

47. On October 29, 2025, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. See dkt. #1

48. To date, the Debtor has not fully complied with its funding obligations under the Drawdown Notice. See Burt Decl. at ¶¶ 27, 29; Hr'g Tr. at 39:25-40:12.

49. The Debtor and Promethean engaged in settlement negotiations but were unable to negotiate an agreement prior to the Debtor filing for bankruptcy. See Hr'g Tr. at 93:21-25; Exhibit 1-11 (communications by and between the Debtor and Prometehan). See also *Minutes*, dkt. #95, p. 4, lines 8-8 ("the parties stipulated that they engaged in settlement negotiations prior to the filing of the instant case.").

---

[11] A copy of the Drawdown Notice was provided to Chambers and admitted into evidence at the December 12 Hearing. See *Minutes*, dkt. #95. See also dkt. #81-2.

### III.     Mr. Gadams' Assets and Liquidity Constraints

50.     A large part of Mr. Gadams' business is real estate development. See Hr'g Tr. at 109:19.

51.     In 2022, Mr. Gadams' businesses "were going very, very well". See Hr'g Tr. at 162:15-19 (Mr. Gadams' testimony).

52.     Mr. Gadams experienced a change in circumstances from 2022—when the Loan Documents were executed—to present day. See Hr'g Tr. at 110:1-4 (Mr. Gadams testifying that his businesses "were booming" in 2022. Thereafter, "there was a lot more cash going out than coming in, in my businesses."), 43:6-10 ("Q. Okay. So it's fair to say that you want the Court to reject the contract because of changes in circumstance, correct? A. Certainly my circumstances have changed, so that's -- that's a [overarching] reason, yes.").

53.     Although Mr. Gadams knew a capital call was forthcoming, he was nevertheless surprised by the magnitude of Promethean's capital commitment call. See Hr'g Tr. at 188-189:23-4 ("Q. But the drawdown wasn't actually issued until June 6th, correct? A. Yeah, correct. Q. Okay. A. But we knew it was coming. Q. You knew something was coming? A. Yeah."), 160:7-17 (Mr. Gadams: "we got … a big call on this one. Fifty-five percent that I was not anticipating. And you know, thought would have been significantly less. But … it wasn't. It was much larger and … could go to one hundred percent, which if which if I can't cover the fifty-five percent, I can't cover the one hundred percent."); 161:15-17 (Mr. Gadams: "this obviously was a huge surprise -- to get a fifty-five percent call … and then … even potentially more on it, with two years left on the loan and a company that was never in monetary default that that always paid its interest.").

54.     As a result of his change in circumstances, Mr. Gadams does not have the liquidity to meet Promethean's capital commitment call or to comply with the Drawdown Notice. See Hr'g Tr. at 44:3-8 ("Q. Is part of the changed circumstance, in your view, that you don't think Puttshack is a good investment? A. If I had twenty-two million dollars, I would have funded that. So I do not have twenty-two million dollars in liquidity, so we wouldn't be here today if I had twenty-two million dollars."), 97:17-22 ("Q. If Dorado Putt were to collect its claims against you and

your wife, it wouldn't need a plan of reorganization. Isn't that right? A. If we personally had the liquidity or the companies had liquidity, they don't. So it's just not a possible options right now.").

55. Mr. Gadams has sufficient illiquid assets at his disposal to meet Debtor's debt obligations, the Drawdown Notice. See Hr'g Tr. at 92:17-20 ("Q. … you have illiquid assets at your disposal that you would need to liquidate in order to meet your obligations, correct? A. Correct."), 97:17-22 ("Q. If Dorado Putt were to collect its claims against you and your wife, it wouldn't need a plan of reorganization. Isn't that right? A. If we personally had the liquidity or the companies had liquidity, they don't. So it's just not a possible options right now."), 98-99:19-7 ("Q. … if a judgement was obtained against Mr. and Mrs. Gadams, could it be satisfied with assets? … A. I believe over time it could be."), 98:8-12, 98:20-25, 99:8-12 ("Q. … if Dorado Putt sued you personally and your wife personally and got a judgment, over time, assets you have would be sufficient to pay the amount owed under the drawdown notice? A. Yes. I just don't know the timing."), 99:20-25 ("Q. … if you individually and your wife were individually sued for the amount owed to Promethean IV, you have assets sufficient to satisfy that judgement? A. I believe so over time."), 101:14-17.

56. It will take time to turn Mr. Gadams' illiquid assets into liquid cash. See Hr'g Tr. at 175:11-13 (Gadams stating that it would take "a year or years to sell certain assets that are just completely illiquid"), 176:1 (Gadams stating that litigation would take "years and years").

57. Mr. Gadams' illiquid assets consist of private equity, venture capital, and real estate interests held through, or distributed among, various entities, some of which include third-party investors. See Hr'g Tr. at 112-113:17-2 ("Q. … you mentioned that that you may have sufficient assets, basically, to pay, if there was any collection efforts made. Whose assets are those that you say you have sufficient to pay? A. So those are other assets. And some of them have investors in them. They're probably a culmination of, you know, maybe thirty different LLCs with anywhere from private equity to venture capital to real estate. So right now they're illiquid assets that are in these different companies. Q. You said illiquid? A. Illiquid assets that are in these different companies.").

58. Following the Drawdown Notice, Mr. Gadams listed three (3) properties for sale to generate liquidity, including one listed for $21.5 million that was under contract as of the December 12 Hearing and another listed for $6.5 million. See Hr'g Tr. at 116-117:12-25.

59. If the three (3) properties are successfully liquidated, Mr. Gadams will be able to satisfy Debtor's debt obligations. See Hr'g Tr. at 118:8-19.

60. Neither of the three (3) properties have been successfully liquidated. See Hr'g Tr. at 118:3-4.

61. In addition to the three (3) properties, Mr. Gadams owns other properties that could be sold but had not been listed for sale as of the December 12 Hearing. See Hr'g Tr. at 118-119:20-17.

62. Although Mr. Gadams testified that he has only $90,000.00 in liquid assets, the record is devoid of documentary evidence regarding the Gadamses' capacity to pay Dorado Putt's debt obligations. See Hr'g Tr. at 115:16-25 (Testimony of Mr. Gadams: "About 90,000 dollars."), 120:7-9 ("Q. So when you say 90,000, you're saying what I personally have access to have. A. Yeah, what I personally have."), 89:2-9 ("Q. … there's no evidence that's been put into the record about your personal capability of paying Dorado Putt, right? A. No. Q. Okay. And there's been no evidence put into the record about your wife's capability of paying Dorado Putt? A. Correct. Q. Same thing with the trusts, right? A. Correct.").

63. In procuring a financing partner to fund a potential future settlement, Mr. Gadams completed a personal financial statement disclosing access to over $90,000.00 through his various companies. See Hr'g Tr. at 119-120:18-1 (Testimony of Mr. Gadams re. "personal financial statement" sent to "entity helping to find fund financing for the settlement"), 120:2-6 ("Q. And that did show that you have more than 90,000 dollars liquid. Did it not? A. It took the combination of all of the companies that we had and the cash in those companies, and … combined it all together."), 120:10-15 ("Q. But when you filled out a personal financial statement, you also included all the cash that all of your companies have access to. A. Correct. Q. And that exceeds 90,000 dollars. A. Correct.").

64. Although Mr. Gadams testified that, to his knowledge, the Gadamses' Trust is solvent, the record is devoid of documentary evidence regarding its capacity to pay Dorado Putt's debt obligations. See Hr'g Tr. at 88:18-19, 89:2-9 ("Q. … there's no evidence that's been put into the record about your personal capability of paying Dorado Putt, right? A. No. Q. Okay. And there's been no evidence put into the record about your wife's capability of paying Dorado Putt? A. Correct. Q. Same thing with the trusts, right? A. Correct.").

65. Neither the Gadamses nor the Gadamses' Trust have filed for bankruptcy protection. See Hr'g Tr. at 88:12-18.

## IV. The Bankruptcy Case

66. In *Amended Schedule A/B*, the Debtor identified the Promissory Note issued by Frank Gadams in the amount of $39,600,000.00. See *Amended Schedule A/B*, dkt. #58-1, p. 10, item no. 71.

67. In *Amended Schedule A/B*, the Debtor identified a "collection of capital call & expenses" claim against the Gadamses under the Look-Through Letter. See *Amended Schedule A/B*, dkt. #58-1, p. 10, item no. 74 ("Any and all causes of action under the Look Through Agreement and the Limited Partnership Agreement and related documents, if any, against Frank and Katherine Gadams to the extent not included in the Promissory Note").[12]

68. In *Amended Schedule E/F*, the Debtor identified Promethean as having an unsecured claim in the amount of $22,127,085.00, which corresponds to the "Capital Call from Partnership Agreement" and constitutes 98.73% of the total unsecured claims identified. Compare *Amended Schedule E/F*, dkt. #87-1, p. 3, item no. 3.4 (Promethean's claim of $22,127,085.00) with item nos. 3.1, 3.2 and 3.3 (claims of $133,481.00, $96,936.00, and $53,487.50 for a combined total scheduled amount of $283,904.50).

---

[12] Although *Amended Schedule A/B* states that the "collection of capital call & expenses" claim is for an "unknown" amount, the *Disclosure Statement* filed on December 2, 2025, states that such claim is for $21,935,085.00. See dkt. #60, p. 59.

69. In *Amended Schedule G*, the Debtor identified the Limited Partnership Agreement as an executory contract to be rejected. See *Amended Schedule G*, dkt. #87-1, p. 5.

70. Debtor's liabilities consist entirely of non-priority unsecured claims. See *Amended Schedule E/F*, dkt. #87-1.

71. The Debtor has more assets than labilities. Compare *Amended Schedule E/F*, dkt. #87-1, p. 4, item no. 5c (total liabilities: $22,410,989.50) and *Amended Schedule A/B*, dkt. #58-1, p. 11, item no. 92 (total assets: $39,748,454.26) with *Disclosure Statement*, dkt. #60 (total liabilities: $22,201,365) (total assets: $61,721,721).[13]

72. On October 30, 2025, following the Debtor's bankruptcy filing, Promethean increased the non-defaulting LPs' capital call obligations from 55% to 80%, to cover the Debtor's share of the capital call (the "**Replacement Call Notice**")[14]. See *Replacement Call Notice*, Exhibit M; Burt Decl. at ¶¶ 42-43.

73. On November 6, 2025, the Debtor filed a *Motion to Reject Limited Partnership Agreement* (dkt. #20) to reject the Limited Partnership Agreement. Promethean filed an objection thereto on November 17, 2025. See dkt. #30.

74. The Debtor seeks to reject the Limited Partnership Agreement because of Mr. Gadams' change in circumstances. See Hr'g Tr. at 42-43:25-10 ("Q. In your opposition to the motion to dismiss in this case, you said the debtor entered into a contract, which although seemingly prudent at the time, has proved financially impossible to comply with due to various changes in circumstance. Do you recall submitting that to this Court? A. Yes. Q. Okay. So it's fair to say that you want the Court to reject the contract because of changes in circumstance, correct? A. Certainly my circumstances have changed, so that's -- that's a [overarching] reason, yes.").

75. On November 17, 2025, Promethean filed its *Motion to Dismiss* (dkt. #31). The Debtor filed an *Opposition to Motion to Dismiss* on December 3, 2025 (dkt. #63), to which the

---

[13] See ibid.

[14] A copy of the Replacement Call Notice was provided to Chambers and admitted into evidence at the December 12 Hearing. See *Minutes*, dkt. #95. See also dkt. #81-2.

Gadamses filed a *Joinder []* on December 5, 2025 (dkt. #75). Promethean filed a *Reply to Motion to Dismiss* on December 10, 2025 (dkt. #83).

76.     On December 2, 2026, the Debtor filed a *Plan of Reorganization*, which contemplates the successful rejection of the Limited Partnership Agreement, as follows: "Promethean as a holder of a rejection damages claim estimated in the amount of $250,000 (comprised basically of legal fees) will receive 100% of its allowed claim, together with interest at 5.5% per annum, or at such other rate as is determined to be a market rate by the Bankruptcy Court, funded from capital contributions to be made by Debtor's majority Member, as detailed in Exhibit E, on the Effective Date." See dkt. #61, pp. 11-12, § Class 2. See also id., p. 17, § 8.1 ("Unexpired executory contracts or leases reflected on Debtor's Schedule G, existing as of filing date, will be deemed as rejected as of the Effective Date."); Hr'g Tr. at 97:18-20 ("Q. …The plan calls for rejecting the LPA altogether? A. Correct.").

77.     The proposed *Plan of Reorganization* will be funded by capital contributions made by the Gadamses. See Hr'g Tr. at 96:14-17 ("A. … we put a plan forward that would pat the creditors in full. And that money … would be given by Frank and Katherine, myself and my wife, you know, directly a capital call …").

78.     The proposed *Plan of Reorganization* contemplates payment of all creditors in full, except Promethean's claim. See *Plan of Reorganization*, dkt. #61; Hr'g Tr. at 103:6-9 ("Q. Other than the LPA, your plan includes payment of all creditor's in full, correct? … A. Yes.).

79.     The proposed *Plan of Reorganization* does not contemplate the Debtor demanding payment from the Gadamses. See Hr'g Tr. at 96:13-17 ("Q. … under Dorado Putt's plan of reorganization, Dorado Putt does not intent to demand from you, Mr. Gadams, your wife, or your trust, even the 11.5 million dollars you were willing to pay before, right? A. The plan does not call for that.").

80.     It is up to the Debtor to pursue the Gadamses under the Look-Through Letter. See Hr'g Tr. at 85:12-15 (Testimony of Mr. Gadams).

81. To date, the Debtor has not issued a demand letter or pursued legal action against the Gadamses or the Gadamses' Trust to satisfy the Drawdown Notice. See Hr'g Tr. at 87-88:3-11.

82. On December 9, 2025, the parties filed a *Joint Report* in connection with the *Motion to Dismiss* (dkt. #81).

83. On December 12, 2025, the court held an evidentiary hearing on the *Motion to Dismiss* where the parties presented evidence in support of their positions, including Confidential Information filed under seal. See *Minutes*, dkt. #95. At the conclusion of the December 12 Hearing, the court ordered the parties to file proposed findings of facts and conclusions of law. See id. See also *Promethean's Proposed Findings of Fact* (dkt. #119); *Debtor's Proposed Findings of Fact* (dkt. #120). The court also stayed other contested matters until a decision on the *Motion to Dismiss*. See *Minutes*, dkt. #95, p. 5, lines 22-23.

84. On December 30, 2025, Mr. Gadams made a $500,000 payment to the Debtor under the Promissory Note. See dkt. #113.

85. On January 13, 2026, the court held an evidentiary hearing on the *Motion for Stay Relief* and related responses. See *Minutes of Hearing Helf on January 13, 2026* (dkt. #133).

86. The Debtor has filed Monthly Operating Reports for October 2025 through March 2026. See dkt. #39, 63, 117, 141, 156, 167 168.

<u>Position of the Parties</u>

I. <u>Promethean</u>

Promethean seeks dismissal for "cause" under 11 U.S.C. § 1112(b)(4) based on the Debtor's alleged bad faith filing, averring that six of the eight factors identified in <u>La Trinidad Elderly LP SE</u>, 627 B.R. 779 (B.A.P. 1st Cir. 2021), as indicia of bad faith are present here. Specifically, Promethean argues as follows:

(1) Debtor has only one real asset, its ownership interest in Promethean and rights appurtenant thereto, which represents "roughly" 30% of Promethean's value. See dkt. #119, p. 20, ¶ 107. And, Promethean's own main assets are warrants covering 7.5% of Puttshack and a second-lien loan to Puttshack. See id.

(2)    Debtor has few unsecured creditors, whose claims are all small in relation to Promethean. Compare *Amended Schedule E/F*, dkt. #87-1, p. 3, item no. 3.4 (Promethean's claim of $22,127,085.00) with item nos. 3.1-3.3 (combined total scheduled amount of $283,904.50). Promethean holds "more than 99% of all of the claims"[15], and given that the Mr. Gadams plans to pay these creditors himself, this bankruptcy has only one real creditor: Promethean.

(3)    Inapplicable. See dkt. #119, p. 19, fn. 4 ("Factor three is inapplicable as the Debtor's one real asset is not real property.").

(4)    This case is a two-party dispute between the Debtor and Promethean.

(5)    The timing of the Debtor's bankruptcy case and Mr. Gadams' testimony evince an intent to delay or frustrate Promethean's legitimate efforts to enforce the LPA, and to impede its efforts to secure a judgment as to Mr. Gadams' personal liability. See In re Plaza Antillana Inc., 2014 WL 585299, at *11 (Bankr. D.P.R. Feb. 14, 2014) (stating that "[t]he desperate resort to filing for bankruptcy on the eve of a consented foreclosure, without ongoing operations and inability to service the secured debt, is atypical conduct which constitutes an abuse of the bankruptcy process"); In re Silberkraus, 253 B.R. 890, 905 (Bankr. C.D. Cal. 2000), *aff'd*, 336 F.3d 864 (9th Cir. 2003) (noting that filing bankruptcy to "[i]mpede, delay, forum shop, or obtain a tactical advantage regarding litigation ongoing in nonbankruptcy forum" is bad faith).

(6)    Debtor has no cash flow and its monthly operating reports reflect only nominal revenue because it is a passive investment holding vehicle. See dkt. No. 63, p. 20 (Debtor noting that its "monthly operating reports … reflect nominal revenue"). Moreover, the funding of all payments under the proposed plan (and in what amount) is left entirely to the discretion of Mr. Gadams. See La Trinidad, 627 B.R. at 800–801; In re Plaza Antillana Inc., 2014 WL 585299, at *11 (Bankr. D.P.R. Feb. 14, 2014) (stating that "[t]he desperate resort to filing for bankruptcy on the eve of a consented foreclosure, without ongoing operations and inability to service the secured debt, is atypical conduct which constitutes an abuse of the bankruptcy process"). Because Debtor's capitalization stems from one source—the Gadamses—there has never been an operating business related to the Debtor which could be reorganized through the bankruptcy process. See In re Las Martas, Inc., 667 B.R. 60, 65 (B.A.P. 1st Cir. 2025) (recognizing that "the absence of a reasonable likelihood of rehabilitation" of a business is a recognized ground for dismissal of a chapter 11 case).

(7)    Inapplicable. See dkt. #119, p. 19, fn. 4 ("Factor seven is inapplicable because the Debtor has no current expenses to meet apart from its obligation to perform the lone contract it is attempting to reject despite having a guaranty of performance

---

[15] Clarification: Promethean's claim is 98.73% of the combined total of the four unsecured claims identified by Debtor.

from its principals, the Gadamses."). In the alternative, Debtor's is not in financial distress. Compare Amended Schedule E/F, dkt. #87-1, p. 4, item no. 5c (total liabilities: $22,410,989.50) with Amended Schedule A/B, dkt. #58-1, p. 11, item no. 92 (total assets: $39,748,454.26). Moreover, the Look-Through Letter operates as a direct funding guaranty for capital call obligations and provides the Debtor with sufficient funds to cover its obligation to Promethean. See In re LTL Mgmt. LLC, 64 F.4th 84, 109 (3rd Cir. 2023) (noting that debtor had a funding agreement, "not unlike an ATM disguised as a contract," that it could draw on to pay liabilities). See also Hr'g Tr. at 99:20-25 (Mr. Gadams testifying that he believes that he and his wife have "assets sufficient to satisfy" any judgment requiring him to pay the amount Promethean is owed by the Debtor) 101:14-17.

(8)  Debtor has no employees. See Hr'g Tr. at 20:5-7 ("Q: … the debtor here has no employees, correct? A: Correct".)

See dkt. #119, pp. 17-28.

Prometehan argues that the bankruptcy was filed to protect the Debtor's principal, Mr. Gadams, who is financially distressed (in the form of lack of immediate liquidity), not for a proper bankruptcy purpose. They argue that the filing of the *Motion to Enforce Automatic Stay* illustrates the Debtor's bad faith filing to protect the financial interests of the Gadamses, not those of the Debtor or its creditors. That despite Mr. Gadams and his wife having "assets sufficient to satisfy" any judgment requiring him to pay what the Debtor owes to Promethean (Hr'g Tr. at 99:20-25, 101:14- 17), Mr. Gadams never caused the Debtor to pursue Mr. Gadams or his wife for the capital call (Hr'g Tr. at 873-88:8) and the proposed plan purports to abandon Debtor's claims against the Gadamses for the benefit of the Gadamses, rather than for the benefit of creditors.

Promethean argues that the *Motion to Reject*, the proposed plan, and the disclosure statement likewise support a finding of bad faith as they evince that the purpose of this bankruptcy case is to protect the Debtor's principals, the Gadamses, not to reorganize. In the *Motion to Reject*, the Debtor states that the LPA is burdensome to the estate and that "forfeiture of the Debtor's interest in [Promethean]… is considerably less burdensome than the potential future capital calls – both of which exceed the amount which the Debtor currently has available – and the cost and expense of continuing as a limited partner in [Promethean]." dkt. #20, ¶ 17. Promethean argues that the foregoing ignores that the Debtor has independent means of satisfying the capital call from the non-debtor Gadamses via (i) the Look-Through Letter, and (ii) litigation claims that the

Debtor allegedly has against the Gadamses for failure to fund its debt obligations. Promethean further argues that Mr. Gadams' testimony contradicts the *Motion to Reject* because Mr. Gadams conceded that the Debtor seeks to reject the LPA because Mr. Gadams' personal circumstances changed, not because the LPA has become burdensome to a debtor that never had any assets in the first place. Rejection of the LPA is an attempt by the Debtor to destroy its primary asset, and will not maximize the value of the estate. See In Re Capitol Food Corp. of Fields Corner, 490 F.3d at 25 (stating that "[t]wo primary purposes of chapter 11 relief are the preservation of businesses as going concerns, and the maximization of the assets recoverable to satisfy unsecured claims"); In re Integrated Telecom Express, Inc., 384 F.3d at 120 (stating that where the debtor is "out of business," the question becomes whether the bankruptcy petition "might reasonably have maximized the value of the bankruptcy estate") (cleaned up, citations and quotations omitted).

In the proposed plan and disclosure statement, the Debtor states that Promethean's unsecured claim is $250,000, which necessarily requires rejection of the LPA. Further, both the proposed plan and Mr. Gadams' testimony at the 341 meeting show that Mr. Gadams, in his capacity as a principal of the Debtor, has no plans to enforce the Look-Through Letter, the Promissory Note, or the scheduled litigation claims against the Gadamses in their personal capacity, which would significantly reduce the value of the estate and recoveries to unsecured creditors.

Lastly, Promethean argues that dismissal is in the best interest of creditors and the estate because irreparable harm would befall Promethean and, by extension, the Debtor and the estate (dkt. #119, ¶ 149).

II.      The Debtor and the Gadamses

The Debtor avers that a mechanical checklist is improper, and that the court should look at the totality of the circumstances and whether the filing seeks a legitimate reorganization purpose. The Debtor makes a three-point argument that its case was filed in good faith. First, that Debtor's "only option … is to seek rejection of the LPA" because "(a) [it] does not have the ability to pay the current capital contribution in full and on a timely basis; (b) the LPA requires the

Debtor to pay any capital contribution in full and on a timely basis, absent Promethean's consent; and (c) Promethean has not and at this time (by its own admission) cannot, consent to allow the Debtor to pay its capital contribution in installments over time." (dkt. #120, p. 42). And, that commencing a Chapter 11 proceeding in order to reject an executory contract is not an indicia of bad faith. See *e.g.*, In re Balboa St. Beach Club, Inc., 319 B.R. 736, 740 (Bankr. S.D. Fla. 2005) ("there is no such thing as 'bad faith' in bringing a bankruptcy case solely for the purposes of rejecting an overly burdensome executory contract."); In re Spoverlook, LLC, 560 B.R. 358, 364 (Bankr. D.N.M. 2016) ("In general, filing a bankruptcy case to reject a lease or executory contract is not bad faith … The power to reject burdensome leases or contracts under [§ 365] was granted to debtors by Congress. Law v. Siegel, [571 U.S. 415] (2014), teaches that bankruptcy courts should not alter the remedies specified in the Code to correct perceived unfairness. The Court therefore is unwilling to characterize Debtor's use of § 365 as bad faith."). "Accordingly, even if Debtor's sole purpose for its bankruptcy filing were to reject the LPA, which it is not, the bankruptcy petition was still filed for a proper and valid bankruptcy purpose and is not constitutive of bad faith" (dkt. #120, p. 41).

Secondly, the Debtor avers that "Promethean's … assertion, that it is the single largest creditor and thus this is essentially a two-party dispute is … misplaced" as follows: "Although Promethean is scheduled with a $22 million (contingent, unliquidated, and disputed) unsecured claim, that claim is based upon the asserted capital call made by Promethean which existed pre-petition. If the LPA is rejected … Promethean's claim … would be substantially similar to the other creditors in this case. As such, this case is not simply a single creditor (or an overwhelmingly larger creditor) dispute" (dkt. #120, p. 42).

Thirdly, the Debtor argues that it did not file on the eve of an arbitration proceeding in order to "frustrate" Promethean's efforts. Instead "[i]t filed the instant case because it lacked the funds to satisfy Promethean's alleged capital call, and … only … after unsuccessfully attempting to resolve this matter for more than a month. … The Debtor … lacks liquidity" (dkt. #120, p. 43). "In contrast to the Debtor's efforts to avoid a Chapter 11 filing, Promethean has done everything

possible to try and gain leverage over the Debtor and, despite the Debtor's warnings that it would be forced to file for bankruptcy protection, continued to insist on conditions that the Debtor could not meet up until the last minute. And it appears that BlackRock was never willing to entertain any of the settlement offers that Debtor earnestly put forward" (dkt. #120, p. 44). The Debtor submits that if Promethean had been successful in obtaining an arbitration judgment requiring the Debtor to immediately pay its debt obligation, the same would have constituted a "catastrophic business event" for which debtors routinely seek Chapter 11 protection, citing La Trinidad, 627 B.R. at 800.

In the alternative, the Debtor addresses the eight factors identified in La Trinidad, as follows:

(1)    Debtor has more than one asset. See *Disclosure Statement*, dkt. #60, § 5.3 (Summary of Debtor's Assets).

(2)    If the Debtor successfully rejects the LPA, Promethean's claim would be substantially similar to the other creditors in this case. See dkt. #120, p. 42.

(3)    Debtor did not address the third factor outright, but did state that it has more than one asset and "even assuming that such were the case … Debtor's ownership of only one asset does not, standing alone, constitute bad faith … As the BAP for the First Circuit noted, 'in single asset real estate cases ... many of the factors can be present[,] even in the absence of bad faith' and 'courts must [therefore] take special care in the analysis of 'bad faith' in such cases' " (dkt. #120, p. 46) (citing La Trinidad, 627 B.R. at 802).

(4)    The mere existence of a two-party dispute does not automatically render a Chapter 11 petition filed in bad faith. Instead, the proper inquiry focuses on whether the debtor filed its petition to achieve a legitimate bankruptcy objective, such as, restructuring its debt. See In re Fraticelli, 2024 WL 4630093, at *5 (Bankr. D.P.R. Oct. 30, 2024) (court concluded that although the case involved "one major creditor and one asset, the bankruptcy petition was not filed simply to create a bankruptcy forum for a two-party dispute based upon non-bankruptcy law, and the filing was made with the clear intended purpose to reorganize".). Although an arbitration was ongoing, no decision had been reached when the bankruptcy filing occurred. If the Debtor successfully rejects the LPA, the arbitration would become largely irrelevant because the remaining issue would be determining Promethean's rejection damages claim, a core bankruptcy matter. Further, Promethean's claim would be comparable in size to those of the debtor's other creditors.

(5) The timing of Debtor's bankruptcy case is motivated by imminent financial distress, which is not improper. See In re Capitol Food Corp., 490 F.3d 21, 25 (1st Cir. 2007); In re Liberate Techs., 314 B.R. 206, 216 (1st Cir. 2007) (citing In re Sylmar Plaza, L.P., 314 F.3d 1070, 1075 (9th Cir.2002) (finding no "bad faith" filing where debtor filed chapter 11 petition to avoid incurring prohibitive lease penalties)).

(6) "Although Debtor's monthly operating reports may reflect nominal revenue, the Debtor's Plan and Disclosure Statement does provide sufficient assets and liquidity to achieve a reorganization and pay all claims in full" (dkt. #120, p. 51).

(7) The capital call represented imminent financial distress. See dkt. #120, p. 52.

(8) "[L]ack of employees is insufficient to support a finding of bad faith or for it to be evidence as lack of employees does not suggest that the Debtor intended to abuse the bankruptcy system[]" (dkt. #120, p. 51).

Assuming *arguendo* that "cause" to dismiss exists under 11 U.S.C. § 1112(b), the Debtor submits that dismissal is neither mandatory nor appropriate because the following "unusual circumstances" within the meaning of § 1112(b)(2) are present: "(1) there is a reasonable likelihood that a plan will be confirmed within a reasonable period of time; (2) there is no continuing loss or diminution of the estate (and none has been alleged); and (3) there is no act or omission that is improper, or violative of the Bankruptcy Code" (dkt. #120, p. 55).

Applicable Law and Analysis

A. Dismissal Pursuant to 11 U.S.C. § 1112(b), Generally

Section 1112(b) of the Bankruptcy Code, 11 U.S.C. § 1112(b), mandates, after notice and a hearing, the conversion or dismissal of a chapter 11 case, whichever is in the best interests of creditors and the estate, if the movant establishes "cause" and the case is devoid of unusual circumstances pursuant to 11 U.S.C. § 1112(b)(2). See 11 U.S.C. § 1112(b)(1). Although the Bankruptcy Code does not define "cause" as that term is used in Section 1112(b), Section 1112(b)(4) provides a non-exhaustive list of circumstances which constitute "cause" for conversion or dismissal. Because the list of causes is nonexhaustive, a case may be converted or

-24-

dismissed for other causes. See, *e.g.*, In re Plaza Antillana Inc., 2014 WL 585299, at *11 (Bankr. D.P.R. 2014)

The initial burden is on the movant to argue and present evidence by a preponderance of the evidence standard to prove its position that there is cause for either conversion or dismissal of the chapter 11 case, whichever is in the best interests of creditors and the estate. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶ 1112.04[4] (16th ed., 2026). "Thus, until the movant carries this burden, the statutory direction that the court 'shall convert the case to a case under chapter 7 or dismiss the case' is not operative." Id. The court, after finding cause, has broad discretion to determine whether conversion or dismissal is in the best interest of creditors and the estate. See Gilroy v. Ameriquest Mortg. Co. (In re Gilroy), 2008 Bankr. Lexis 3968, 2008 WL 4531982 (B.A.P. 1st Cir. 2008). However, if the movant proves that there is cause for dismissal pursuant to 11 U.S.C. § 1112(b)(4) by a preponderance of the evidence, the court must find that movant has established cause. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶ 1112.04[4] (16th ed., 2026).

Once "cause" has been established, the burden shifts to the debtor to identify unusual circumstances that evince that conversion or dismissal is not in the best interest of creditors and the estate. Even, if there are no unusual circumstances, the court may not convert or dismiss a case if the debtor establishes and the court finds that: "(1) there is a reasonable likelihood that a plan will be confirmed within a reasonable time; (2) the cause' for dismissal or conversion is something other than a continuing loss or diminution of the estate coupled with a lack of reasonable likelihood of rehabilitation; and (3) there is a reasonable justification or excuse for a debtor's act or omission and the act or omission will be cured within a reasonable time." In re Orbit Petroleum, Inc., 395 B.R. 145, 148 (Bankr. D.N.M. 2008).

B.      Lack of Good Faith (or Bad Faith) as Cause to Dismiss

In In re Costa Bonita Beach Resort, Inc., 479 B.R. 14 (Bankr. D.P.R. 2012), this court held that lack of good faith (or bad faith) in filing a chapter 11 petition constitutes "cause" to dismiss pursuant to 11 U.S.C. § 1112(b)(1). In so doing, the court also rejected the use of the

mechanical checklist approach to determine lack of good faith for all cases. In pertinent part, the court stated the following regarding lack of good faith (or bad faith) as a cause for dismissal of a chapter 11 petition:

> "Good faith is not a statutory requirement for the filing of a Chapter 11 petition. However, it is a requirement for a Chapter 11 plan to be confirmed. 11 U.S.C. § 1129(a)(3). The unsettled issue is whether lack of good faith (or bad faith) may constitute "cause" to dismiss a Chapter 11 petition under 11 U.S.C. § 1112(b)(1). See Ali M.M. Mojdehi & Janet Dean Gertz, The Implicit "Good Faith" Requirement in Chapter 11 Liquidations: A Rule in Search of a Rationale?, 14 Am. Bankr.Inst. L.Rev. 143 (2006). Any determination of good faith, or lack of good faith (bad faith) is fact intensive and must consider the totality of the circumstances on a case by case basis. In Chapter 11 cases the court must carefully consider the distinctions between liquidation and reorganization as both are valid objectives under the Bankruptcy Code.
>
> Several Circuits have determined that lack of good faith (or bad faith) in filing a chapter 11 bankruptcy petition constitutes "cause" to dismiss or convert a case to Chapter 7 pursuant to 11 U.S.C. § 1112(b). See Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F.2d 1068 (5th Cir.1986); In re Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture), 936 F.2d 814 (5th Cir.1991); Carolin Corp. v. Miller, 886 F.2d 693 (4th Cir.1989); Trident Assocs. Ltd. Partenership v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. Partnership), 52 F.3d 127 (6th Cir.1995); NMSBPCSLDHB, L .P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108 (3rd Cir.2004); In re Albany Partners, Ltd., 749 F.2d 670 (11th Cir.1984). The First Circuit has not decided whether lack of good faith (or bad faith) in the filing of a Chapter 11 bankruptcy petition constitutes "cause" under 11 U.S.C. § 1112(b). See Fields Station LLC v. Capitol Food Corp. (In re Capitol Food Corp.), 490 F.3d 21, 24 (1st Cir.2007). One court declined the proposition that 11 U.S.C. § 1 112(b) imposes a good faith filing requirement in a SARE case. See In re Victoria Ltd. Partnership, 187 B.R. 54, (Bankr.D.Mass.1995).
>
> The First Circuit has determined that if 11 U.S.C. § 1112(b) imposes a good faith filing requirement, then it is the movant that must establish *prima facie* that the petition was filed in bad faith before the burden shifts to the debtor. See In re Capitol Food Corp., 490 F.3d at 24 ("Although the bankruptcy court held that subsection 1112(b) imposes no good faith filing requirement, we need not address this matter in the present case. Even the courts which have found a good faith filing requirement would demand that Fields Station first make a *prima facie* showing that Capital Food filed its petition in bad faith."); Farnsworth v. Morse (In re Farnsworth), 2009 Bankr.Lexis 3699, *18, (B.A.P. 1st Cir.2009); In re Miller, 2009 Bankr.Lexis 3351, *4 (Bankr.D.Mass.2009). The First Circuit noted that, "[c]atastrophic business events, such as an imminent or threatened foreclosure on the debtor's interests in real property essential to successful reorganization efforts,

are precisely the sort of imminent financial distress for which debtors routinely seek chapter 11 protection." In re Capitol Food Corp., 490 F.3d at 25 citing In re Liberate Techs., 314 B.R. 206, 216 (Bankr.N.D.Cal.2004). The First Circuit also observed that a good faith petition must seek to preserve or create some value that would otherwise be lost outside of bankruptcy and that it is not bad faith to seek to gain an advantage from declaring bankruptcy. Id. at 25.

The determination of whether the movant has established *prima facie* that there is a lack of good faith (or bad faith) in the filing of a bankruptcy petition is a fact intensive inquiry in which the court analyzes the totality of the circumstances. See In re Farnsworth, 2009 Bankr.Lexis 3699, *20 citing Marrama v. Citizens Bank of Mass. (In re Marrama), 430 F.3d 474, 482 (1st Cir.2005) *aff'd*, 549 U.S. 365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007). Lack of good faith or bad faith is atypical conduct that constitutes an abuse of the bankruptcy process. See Marrama v. Citizens Bank, 549 U.S. 365, 375, 127 S.Ct. 1105, 166 L.Ed.2d 956, fn. 11 (U.S.2007); Berliner v. Pappalardo (In re Puffer), 674 F.3d 78, 82 (1st Cir.2012). Good faith is driven by the congressional intent of Chapter 11 relief. "Chapter 11 is designed to offer greater recovery for creditors and equity owners than liquidation in a Chapter 7 case by providing a means by which financially distressed businesses or individuals may restructure their finances by obtaining confirmation of a plan which provides either a continuation of the business, or retention or orderly sale of assets, and exiting bankruptcy relieved of burdensome debts and obligations." Hon. Nancy C. Dreher & Hon. Joan N. Feeney, Bankruptcy Law Manual, § 11.1 (5th ed. 2011).

The totality of the circumstances test cannot be reduced to a mechanical checklist (irrespective of the chapter or whether it is in the filing of the petition and/or the confirmation of the plan). See In re Puffer, 674 F.3d at 81 ("The totality of the circumstances test cannot be reduced to a mechanical checklist, and we do not endeavor here to canvass the field and catalogue the factors that must be weighed when determining whether a debtor has submitted a Chapter 13 plan in good faith"). The First Circuit has determined that, "in all events, good faith is a concept not a construct. Importantly, it is a concept that derives from equity. This matters because equitable concepts are particularly insusceptible to per se rules." In re Puffer, 674 F.3d 78, 82. Thus, this court, in conformity with the determinations of the First Circuit in In re Puffer rejects the mechanical checklist approach for a determination of lack of good faith (or bad faith) for all cases, irrespective of whether they are SARE cases. Good faith is an abstract idea generalized from particular circumstances and not a working assumption." Id. 479 B.R. at 39–40.

479 B.R. at 39-40. See also Plaza Antillana, 2014 Bankr. LEXIS 634, 2014 WL 585299 (finding that movant established *prima facie* that debtor filed its bankruptcy petition in bad faith, and stating that "filing for bankruptcy on the eve of a consented foreclosure, without ongoing operations and inability to service the secured debt, is atypical conduct which constitutes an abuse

-27-

of the bankruptcy process."); In re Rodriguez, 2022 Bankr. LEXIS 1341, 2022 WL 1308081 (Bankr. D.P.R. 2022) (finding cause pursuant to 11 U.S.C. § 1112(b) for filing a petition in bad faith. No "unusual circumstances" were demonstrated); In re Ginorio, 2024 WL 739327, at *7-8 (Bankr. D.P.R. 2024)

This court's analysis of bad faith as a cause for dismissal of a bankruptcy petition was cited with approval and applied by the U.S. Bankruptcy Appellate Panel for the First Circuit (the "**Panel**") in La Trinidad, *supra*. In pertinent part, the Panel stated the following:

> The issue of whether lack of good faith ("bad faith") constitutes cause for dismissal is "unsettled," and "debated." The First Circuit "has expressly declined to decide" the issue. Nonetheless, "[t]here is a well-developed body of case law that holds that chapter 11 petitions can be dismissed for lack of good faith." Several courts of appeals have determined that lack of good faith (or bad faith) in filing a chapter 11 petition constitutes "cause" to dismiss or convert a case under § 1112(b). In holding that lack of good faith could constitute cause for dismissal, the Third Circuit explained:

>> Four factors guide our adoption of a good faith standard—the permissive language of § 1112(b), viewed in light of its legislative history; the decisions of our sister courts of appeals; the equitable nature of bankruptcy; and the purposes underpinning Chapter 11.

> The legislative history of the statute reflects that "[t]he court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases."

> "[T]he overwhelming majority of courts considering the issue agree that an implicit good faith filing requirement exists under § 1112(b), and that a Chapter 11 case may be dismissed for cause if it was filed in bad faith." "The equitable nature of [the 'for cause'] determination supports the construction that a debtor's lack of 'good faith' may constitute cause for the dismissal of a petition." Most bankruptcy courts and at least one district court within this circuit that have considered the issue in published opinions have also concluded that bad faith constitutes cause for dismissal. The Panel has not yet addressed this issue in the chapter 11 context, although it has previously ruled that lack of good faith is grounds for dismissal of a chapter 13 petition.

> We are persuaded by the abundant, well-reasoned authority holding that lack of good faith can constitute cause for dismissal of a chapter 11 petition under § 1112(b). Accordingly, the bankruptcy court below did not commit error when it so ruled.

La Trinidad, 627 B.R. at 799-800 (citations omitted).

C.      Relevant Considerations in Determining Lack of Good Faith (or Bad Faith)

In La Trinidad, the Panel further observed that [w]hile there is no single formulation of what constitutes lack of good faith (or bad faith), courts have concluded that the good faith determination involves a fact-intensive inquiry", and applied the following eight-factor test:

(1)    the debtor has only one asset;
(2)    the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
(3)    the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
(4)    the debtor's financial condition is, in essence, a two[-]party dispute between the debtor and secured creditors which can be resolved in the pending state court foreclosure action;
(5)    the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
(6)    the debtor has little or no cash flow;
(7)    the debtor cannot meet current expenses, including the payment of personal property and real estate taxes;
(8)    the debtor has no employees.

La Trinidad, 627 B.R. at 800-801, quoting In re PM Cross, LLC, 494 B.R. 607, 618 (Bankr. D.N.H. 2013). All of the factors need not be present. See id.

D.      Whether the Factors Support a Finding that the Petition was Filed in Bad Faith

With this framework in mind, the court will consider whether the totality of the circumstances indicate that the Debtor's bankruptcy petition was filed in bad faith, as supported by the record and the uncontested facts in this case.

The first and third factors are not present. In addition to its investment in Promethean, the Debtor manages and owns various assets. See Hr'g Tr. at 22:6-12, 23:3-8, 26:22-25, 151:16-18, 152:15-18. See also Amended Schedule A/B, dkt. #58-1; Disclosure Statement, dkt. #60, § 5.3 (Summary of Debtor's Assets). The court finds that the remaining six factors are present.

The second factor is present; the Debtor's liabilities consist entirely of non-priority unsecured claims, and Promethean's claim amounts to 98.73% of the combined total unsecured

claims identified by the Debtor. Plainly, the Debtor has few unsecured creditors whose claims are small in relation to those of Promethean. Compare *Amended Schedule E/F*, dkt. #87-1, p. 3, item no. 3.4 (Promethean's claim of $22,127,085.00) with item nos. 3.1, 3.2 and 3.3 (other unsecured claims totaling $283,904.50). The fourth factor is present; the Debtor's alleged financial distress stems from a two-party dispute with Promethean rather than a broader need for reorganization. The Debtor contends that this bankruptcy case was filed to reorganize its debt obligations through the rejection of the Limited Partnership Agreement, characterizing its condition as one of "imminent financial distress". The record supports otherwise. Before executing the Promissory Note, no creditor had undertaken any collection efforts against the Debtor. See Hr'g Tr. at 167:16-19 ("Q. So when this happened in May, were there any collection efforts made by any creditors against Dorado Putt? A. No."). Moreover, the Debtor's proposed plan of reorganization does not contemplate enforcing the Debtor's rights to repayment against the Gadamses under the Look-Through Letter. According to Mr. Gadams, *he* (in his personal capacity) lacks sufficient liquidity (despite having plentiful assets) to satisfy the Debtor's debt obligations. The record, however, is devoid of evidence to substantiate Mr. Gadams' assertions. As a result, the Debtor is voluntarily forfeiting its own right to repayment from a valuable source of recovery (the Gadamses) while shifting the resulting loss to Promethean, its largest creditor and the only creditor who will not be paid in full under the proposed plan. See Hr'g Tr. at 154:22-155:19 (the court: "the rejection of the limited partnership agreement is a factor that should be considered as grounds for the dismissal of the case as being the debtor's … principal asset."). As noted above, a good faith petition must seek to preserve or create some value that would otherwise be lost outside of bankruptcy, not seek to gain an advantage from declaring bankruptcy. Consequently, the Debtor's asserted financial distress is not the product of creditor pressure or an inability to meet obligations as they come due. Rather, it arises from the Debtor's dispute with Promethean and its decision not to pursue repayment rights that could benefit the estate.

The fifth factor is present; the timing of this bankruptcy case is meant to delay or frustrate Promethean's legitimate efforts to enforce its rights under the Loan Documents. The sixth factor

is also present; since it was formed, the Debtor has not earned any revenue and maintained nominal cash flow. See Hr'g Tr. at 26:12-14, 44:13-14. See also Balance Sheet dated October 30, 2025, *Disclosure Statement*, dkt. #60, p. 59 (Cash: "$573"); Interim Profit and Loss January 1 - October 31, 2025, *Disclosure Statement*, dkt. #60, p. 60 (Income: "$ -"). The Monthly Operating Reports for October and November 2025 reflect cash balances of just $573. See dkt. #39, 62. The Monthly Operating Reports for December 2025 reflects a $500,000 increase, due entirely to the Promissory Note payment by Mr. Gadams. See dkt. #117. Thereafter, the Debtor's cash balance steadily declined—from $500,573 in January 2026 to $439,102 by the end of April 2026—as the funds were used to satisfy tax obligations, attorneys' fees, and other expenses. See dkt. #141, 156, 167, 168. Moreover, the funding of all payments under the proposed plan sems to be from one source—the Gadamses— and not from any revenue generated by the Debtor.

The seventh factor is present; the Debtor has the ability to meet its current expenses and is not in imminent or immediate financial distress. The Debtor's schedules reflect that its assets exceed its liabilities. Compare *Amended Schedule E/F*, dkt. #87-1, p. 4, item no. 5c (total liabilities: $22,410,989.50) and *Amended Schedule A/B*, dkt. #58-1, p. 11, item no. 92 (total assets: $39,748,454.26) with *Disclosure Statement*, dkt. #60 (total liabilities: $22,201,365) (total assets: $61,721,721). The Look-Through Letter and the resulting "collection of capital call & expenses" claim against the Gadamses operate as a funding backstop or guaranty for capital commitment call obligations and, if enforced, constitute a readily identifiable source of funds available to the estate, sufficient to satisfy the Debtor's obligations to Promethean. See In re LTL Mgmt. LLC, 64 F.4th at 109 (noting that debtor had a funding agreement, "not unlike an ATM disguised as a contract," that it could draw on to pay liabilities). The Debtor's alleged inability to meet its current expenses therefore results not from a lack of available assets, but from its decision not to pursue those rights. And finally, the eight factor is also present because the Debtor has no employees. See Hr'g Tr. at 20:5-7.

The totality of the circumstances supports the court's conclusion at the December 12 Hearing: Promethean has submitted sufficient evidence to establish a *prima facie* case that the

instant petition was filed in bad faith, and that this case is a two-party dispute filed to protect the assets of the Debtor's principal, Mr. Gadams. See Hr'g Tr. at 154-155:22-15. The Debtor's arguments to the contrary and the evidence submitted in support, including Mr. Gadams' own testimony, do not support a finding that this case was filed in good faith.

Having found "cause", the court must decide whether conversion or dismissal is in the best interest of the creditors and the estate. The Debtor avers that conversion or dismissal is not mandatory because "unusual circumstances" exist. However, case law supports the conclusion that "bad faith" cannot be cured or justified such that the exception to dismissal under 11 U.S.C. § 1112(b)(2) applies. See, *e.g.*, In re Phoenix Piccadilly, Ltd., 849 F.2d 1393, 1395 (11th Cir. 1988), citing In re Nat. Land Corp., 825 F.2d 296, 298 (11th Cir. 1987) ("The possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith"); In re Ozcelebi, 639 B.R. 365, 425 (Bankr. S.D. Tex. 2022) ("[G]iven those [bad faith] findings, there is no reasonable likelihood that Debtor could confirm a plan pursuant to § 1191(b), which incorporates § 1129(a)(2), requiring that '[t]he proponent of the plan complies with the applicable provisions of this title.' "); In re LTL Mgmt., LLC, 652 B.R. 433, 453 (Bankr. D.N.J. 2023), *aff'd sub nom.*, 2024 WL 3540467 (3rd Cir. 2024). ("lack of financial distress is not the type of 'bad faith' that could be subject to the § 1112(b)(2) exception to prevent dismissal or conversion …"); In re SGL Carbon Corp., 200 F.3d 154, 159, fn. 8 (3rd Cir. 1999) ("In bad faith cases involving the filing of a petition that is an abuse of the bankruptcy process … § 1112(b)'s conversion/dismissal choice is inappropriate. The proponent of an abusive petition does not belong in bankruptcy so it is unnecessary to ask whether dismissal or conversion is in the interest of the creditors.").

## Conclusion

The court concludes that Promethean has established *prima facie* that the Debtor filed this bankruptcy petition in bad faith, which constitutes "cause" for dismissal under 11 U.S.C. § 1112(b)(1). The court further concludes that the Debtor's lack of financial distress constitutes an abuse of the bankruptcy process which may not be cured or justified under 11 U.S.C. §

-32-

1112(b)(2)'s exceptions to dismissal. As noted above, bankruptcy must seek to preserve or create some value that would otherwise be lost outside of bankruptcy. Dismissal, and not conversion, is in the best interest of the estate. The court finds and concludes that the bankruptcy petition was filed to protect the Gadamses' assets rather than those of the Debtor, effectively reducing the case to a two-party dispute.

For the reasons stated herein, the *Motion to Dismiss* (dkt. #31) is GRANTED and the case is hereby dismissed. Consequently, the court need not decide whether enforcement of or relief from the automatic stay is appropriate.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 22nd day of June 2026.

Enrique S. Lamoutte
United States Bankruptcy Judge

-33-